ROBERT W. RAINWATER, Oregon State Bar No. 084489
Email: rrainwater@rainwaterlaw.org
Rainwater Law Group
1327 SE Tacoma Street
Portland, Oregon 97202
Telephone: (971) 271-7566
Fax: (503) 231-8276

Attorney for Defendant
MARK DOUGLAS GILL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:14-cr-00275-JO |
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS EVIDNECE |
| v. | |
| MARK DOUGLAS GILL | |
| Defendants. | |

## FACTUAL BACKGOUND

**I.  Charges.**

On July 14, 2014, a two-count indictment was filed in this case. The indictment charged

Mr. Gill with conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1)

and 846 [Count One] and possession with intent to distribute methamphetamine in violation of

Gill Memorandum of Points and                    1
Authorities in Support of Motion
To Suppress

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) [Count Two]; it also included a criminal forfeiture – drug offense allegation. It is alleged that Count One occurred beginning in January 2014 and continuing through June 19, 2014 and that Count Two occurred on or about June 18 and 19, 2014.

**II.     Issuance of the search warrant and the seizures pursuant thereto.**

On June 17, 2014 an application for a search warrant was signed by Honorable Paul Papak, United States Magistrate Judge, asking for permission to search the person of Mark Douglas Gill and his residence at 787 Cedar Street, Fairview, Oregon. The application asked for permission to search for evidence of a crime related to the offense of witness tampering and conspiracy to commit witness tampering in violation of 18 U.S.C. §§ 1512(b) & 1512(k). See the attached Exhibit "A."

Joshua Zwich a deputy with the Multnomah County Sheriff's Office prepared the search warrant affidavit. The affidavit states that Deputy Zwich believes he had "probable cause to believe that Mark Gill is engaged in federal witnesses tampering and conspiring to tampering with witnesses" and that his "residence . . . contains evidence of the crimes." See Exhibit "A" page 3. The affidavit then lists the facts supporting probable cause as follows (omitting the paragraph numbering):

> "This affidavit will describe information from a testifying reliable informant (TRI), Kimberly XYZ[1] and Deuce Mark Romero (who was arrested June 12, 2014, on a probation violation for being found in possession of a firearm).

---

[1] I am aware of this person's last name, but I am not including it in this affidavit in order to protect her identity from those involved in the witness tampering crimes described throughout this document.

Gill Memorandum of Points and Authorities in Support of Motion To Suppress        2

I know the TRI to be reliable because the TRI has provided me with information regarding users and sellers of controlled substances which I know, from my experience as a narcotics officer, to be true; but which the TRI could not know that I knew. Additionally, investigative information received from the TRI has always been accurate upon verification by law enforcement officers. The Court should be aware that the TRI has received a promise for consideration in exchange for the information provided herein. The consideration that TRI has received may include financial compensation, dismissal or reduction of pending criminal charges, or an agreement to recommend a reduced sentence regarding the pending criminal case. The Court should also be aware that the TRI has on felony conviction that could be used to impeach TRI under Federal Rule of Evidence 609.

Within the last 30 days I received a phone call from the TRI. The TRI told me the TRI is scared for the TRI and the TRI's family. The TRI told me there is someone named "Deuce" who was hired by Bobby Reese and Bobby Hammond to **find the TRI**. Based on the information I have from other confidential reliable informants (CRIs), I know Bobby Reese is currently running the gang "BROOD" (Krude Rude Brood) and Bobby Hammond is a member of the European Kindred (EK) gang. I know Hammond has been convicted of burglary, theft, gun charges, and was involved in, but not yet convicted of, at least one armed robbery.

The TRI told me that TRI received the information about this potential danger from a friend named "Kim." According to the TRI, Kim relayed to TRI that "Deuce" was just at Kim's house and was asking **where the TRI was or if Kim had a phone number for TRI**. Kim told the TRI, who in turn told me, that Deuce **was looking for the TRI** on behalf of Bobby Reese and Bobby Hammond because they believed the TRI was testifying against David Corbit. I am aware that Dave Corbit is a local leader of the Krude Rude Brood (KRB), and is currently pending trials in state and federal court. On February 27th, 2014, David Corbit was arrested on federal charges for Conspiracy to Deliver Methamphetamine (14-CR-93-MO). Corbit was also indicted by the State of Oregon in March 2013 for violent crimes including Unlawful Use of a Weapon, Kidnap I, and Assault II, stemming form a violent incident that occurred in his auto body shop.[2]

Within the past four months, I have listened to several recorded jail calls placed by Dave Corbit to associates who are out of custody. In several calls,

---

[2] I am also the lead investigator in the Multnomah County Kidnap and Assault case. I am aware that the Multnomah County indictment on Corbit listed the names of witnesses testifying before the grand jury, including the victim from that case who is different from the TRI described herein. After his arrest and detention on state charges, I intercepted a letter that Dave Corbit wrote to one of his victim's while in jail and gave to an inmate that was being released with instructions to deliver it to the victim's family. Based on my review of the letter, it is my opinion that Corbit sent it with the intent to sway the victim's testimony in the Multnomah County Case.

Gill Memorandum of Points and                    3
Authorities in Support of Motion
To Suppress

Corbit tells his girlfriend Laura Hazzard that he cannot do 15 years in prison, he makes statements about being stressed out and sounds desperate to get out of his current predicament. I am aware that the global resolution proposed to Corbit by prosecutors was for approximately 15 years. Corbit also tells his girlfriend that M ____[3] is going to call her and it has to do with his "Freedom." Later, in another recorded call, Corbits girlfriend tells him that M ____ is mad at her; in response, Corbit is heard losing his composure, and expresses anger with Hazzard for her failure to accomplish this project. I heard Corbit instruct Hazzard to send Shanan Kelly[4] over to M ____'s house to deal with it. Upon hearing these calls, I prioritized this matter, identified M ____, and relayed to him that I was aware that he was involved with Dave Corbit, that Corbit had asked him to do something, and that in my opinion it would be a very poor idea for him to carry out any activities or deliver any messages on behalf of Dave Corbit. I also warned M ____ that Corbit was sending a Brood enforcer (Shanan Kelly) to his house. In the days after I approached M ____, I listened to recorded jail calls and heard Corbit instruct Hazzard that the "Feds" were on it and that she should not send Shanan Kelly to go over to the house. In late May, I arrested Shanan Queen (aka Shanan Kelly) and searched his phone pursuant to a search warrant. In Queen's phone, I found a received text message from "DC Laura" who I believe to be Laura Hazzard (Dave Corbit's Laura). The message read: "Please DON'T go over there. I spoke with Dave and he said fonts. K. Thx!" Based on my training and experience attempting to interpret text message codes, as well as factual context described herein, I believe that "fonts" could either mean "Feds on that shit" or simply a typo for "don't."

    The TRI provide me with a Portland-area address for Kim. On June 11, 2014, Deputy Ferguson and I went to that location and interviewed Kim XYZ. I asked Kim about "Deuce" and she told me Deuce showed up at her apartment within the last two weeks, but she could not remember the exact date. Kim told me Deuce told her out of respect for Kim's "ex", Deuce was not going to do the job he was hired to do. According to Kim, Deuce told her he was hired by Bobby Reese and Bobby Hammond **to find the TRI because the TRI is testifying against David Corbit, and he was supposed to find the information about TRI's current whereabouts and get the information back to Reese and Hammond**.

---

[3] I am aware of the person's full name, but I am not including it in this affidavit in order to protect his identity from those involved in the witness tampering crimes described throughout this document.

[4] I know Kelly to be Shanan Queen (Shanan Kelly is an alias he uses) who is an original Brood member and an enforcer for the gang. I also know that weeks after this recorded call, I arrested Mr. Shanan Queen in late May after a search warrant at his residence revealed 9 handguns, two shotguns (including one sawed-off shotgun), methamphetamine, marijuana, daggers, a bullet proof vest, digital scales, and neo-Nazi paraphernalia.

Kim told me she did not think Deuce was going to take action on finding or hurting TRI, but she (Kim) is scared to death of Bobby Hammond. I am aware that this is a widely-held fear. Kim told me Deuce has a phone number of . . .[5] Kim also said she was also scared for her own safety because Deuce told her that can happen is they (i.e. Hammond and/or Reese) go after your daughter to get to you. Kim reported that Deuce told her they (i.e. Hammond and/or Reese) reached out to Deuce because they did not want this scheme to be traced back to Brood members. The Court should be aware that Kim XYZ has been convicted of felony crimes that could be used to impeach her under Fed. R. Evid. 609.

On June 12, 2014, I was able to identify "Deuce" as Mark Deuce Romero. Multnomah County Parole and Probation Officer Byran Smith told me Deuce Romero has a listed cell phone of . . . registered with the Oregon Department of Justice and is currently on probation for PCS Methamphetamine. Parole and Probation Officer Smith told me Deuce Romero has a listed address of . . . Clackamas County, Oregon. Members of Multnomah County Special Investigation Unit went to the above address to interview Deuce. I observed Deuce walking on SE Blanton Street with his 18-month-old son. I exited my vehicle and said, "Hey Deuce." Deuce responded "What's up?" I then displayed my badge and identified myself. We shook hands and I asked to speak with him. I asked Deuce if he would be more comfortable speaking outside or inside his residence. Deuce indicated he would prefer to speak to us inside his house. I noticed Deuce was holding a cell phone. I asked if that was his phone and he said, "Yes." I asked Deuce if I could hold it and he said, "Sure."

I followed Deuce inside and three others walked behind us into his residence at . . . Deuce walked us upstairs to his room. I explained why we were there and asked Deuce why he was asking Kim about TRI. Deuce said he heard on the street that **TRI was testifying and wanted to warn Kim not to get involved with these people**. This is not consistent with the account I received from Kim. I asked Deuce if I could search his phone for evidence and he said, "Yes." I asked Deuce where he heard the information about TRI being a testifying witness, and Deuce said, "Mark called me and told me. **[Mark] said they were looking for the "TRI."** Later in our interview, Deuce identified "they" as Bobby Hammond and Bob Reese. According to Deuce, Mark told him, **"I can either pay you to find the TRI or pay the Russians."**

I asked Deuce who "Mark" was, and Deuce described him as an older guy that lives out east and hangs with Joseph Jacobus and Bob Reese. Based on my nearly 12-month investigation into Operation White Christmas, the approximately 50 defendants arrested therein, and the dozens of Brood, EK, AOB, and FBK gang members I have interviewed in this investigation, I believed "Mark" reference by Deuce is on Mark Gill, a Brood associate who is also associated with Bob Reese. **I asked Deuce if "Mark" was in fact Mark Gill and he said,**

---

[5] The phone numbers and addresses in the affidavit are redacted from this memorandum.

Gill Memorandum of Points and
Authorities in Support of Motion
To Suppress

5

"**Yes.**" Deuce said he did not have a phone number to call Mark back because Mark called from a restricted number.[6] Deuce said he went to **Kim's house to warn her about these individual looking for TRI.**

Deuce told us he used to work for Bobby Reese in the past. Deuce explained that Reese would ask Deuce to find subjects that owed Reese drug money and Deuce would find them for him. Deuce said he also purchased methamphetamine in the past from Reese. Probation Officer Smith asked for consent to search his residence and Deuce said, "Yes." I was notified that Smith found loaded handgun in Deuce's backpack.

During the past year I have been the lead investigator in Operation White Christmas. I have de-briefed several Confidential Reliable Informants (CRI's). Several of these CRIs have, independent from one another, told me that Mark Gill lives in Fairview and has a subject named Woody living with him. The CRIs have told me Woody is very good with police scanners and is always listening to them. I know through this investigation that one of the controlled buys with a drug-dealer target was interfere with because certain criminal associates heard about law enforcement approach on the scanner that originated from Gill's residence. I know from this investigation that Mark Gill's associates are involved in ID theft, firearms trafficking and methamphetamine distribution.

A CRI also told me that when the CRI was release from prison, the CRI contacted Mark Gill for a ride and a place to stay. The CRI told me Gill sent a female to pick up the CRI and the female had a shot syringe full of methamphetamine for the CRI from Gill. Deputy Burkeen told me within the last year he had information that Mark Gill was involved in the distribution of methamphetamine. Burkeen has seen Reese at Gill's Fairview residence, the location described more particularly in Attachment A.

I know from checking the law enforcement data system that Mark Gill is a convicted felon. Specifically, LEDS show Mark Gill, (born in 1965) to be convicted in 2009 of felony unlawful possession of methamphetamine, 2003 delivery/manufacturing of controlled substance, 2003 Forgery I and Theft, 2002 possession of controlled substance, 2001 unlawful use of motor vehicle, 1999 felon in possession of a firearm, 1998 possession of controlled substance, 1995 possession of controlled substance, and 1985. Burglary I." [Emphasis added] See Exhibit "B."

---

[6] Deuce claimed he did not have a way to reach Mark. **This would seem to suggest that those involved in the tampering did not plan to carry out the threat through violence or any contact with the TRI**. However, it is also possible that Deuce was not truthful on that point. Moreover, even if not carried out through physical contact, the tampering was effective in that news of this search for the TRI reached the TRI and put the TRI on notice that dangerous individuals are paying people to find the TRI because of a belief that TRI is a cooperating witness.

Gill Memorandum of Points and Authorities in Support of Motion To Suppress

6

**II. Applicable Law.**

    **A.  The Fourth Amendment Exclusionary Rule.**

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized. United States Constitution, Forth Amendment. Evidence obtained in violation of the Fourth Amendment must be excluded from a federal criminal prosecution.  Weeks v. United States, 232 U.S. 383, 398 (1914).

    **B.  Standing.**

To challenge a search on Fourth Amendment grounds, a defendant must show that he personally has an expectation of privacy in the place searched, and then establish that the expectation is reasonable based on concepts of real or personal property or on "understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Here the residence searched was Mr. Gills, this by itself establishes the requisite reasonable expectation of privacy. An uncontroverted affidavit claiming residence, as here, establishes the requisite expectation of privacy. *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987).

    **C.  Challenge to the Warrant.**

A search warrant is invalid if the issuing magistrate lacked a "substantial basis" to conclude that the supporting affidavit established probable cause to justify a search.  United States v. Clark, 31 F.3d 831, 834 (9th Cir. 1994), cert. denied, 513 U.S. 1119 (1995).

Gill Memorandum of Points and        7
Authorities in Support of Motion
To Suppress

The task of the issuing magistrate is . . . to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is . . . to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed. Illinois v. Gates, 462 U.S. 213, 238 (1983); *Massachusetts v. Upton*, 466 U.S. 727 (1984).

**D. Probable Cause to Search.**

There are two matters that must be adequately shown before a search warrant may lawfully issue: the "commission element" and the "nexus element." "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the commission element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called nexus element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). Accord, United States v. Rodriguez, 869 F.2d 479, 484 (9th Cir. 1989) (the issuing judge must find a "reasonable nexus" between the contraband sought and the residence).

Probable cause means more than bare suspicion; it exists "where the facts and circumstances within [police officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient . . . to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175 (1949). A warrant to search for evidence may be issued only "upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place . . . ." Steagald v. United States, 451 U.S. 204, 213 (1981). Information supporting probable cause must be "so

closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." Sgro v. United States, 287 U.S. 206, 210 (1932).  The search warrant "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause," a requirement that cannot be met by a "wholly conclusory statement." Gates, 462 U.S. at 239. "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Gates, at 239.

### E. When the Affidavit Is False or Misleading.

A hearing is required on the truthfulness and completeness of factual statements made in an affidavit supporting a search warrant under the following circumstances:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause . . . . Franks v. Delaware, 438 U.S. 154, 155-156 (1978).  "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a truthful showing." Id. at 164.

This rule extends to deliberate or reckless omissions of material facts as well as to affirmative misstatements.  United States v. Tham, 948 F.2d 1107, 1111 (9th Cir. 1991).  When "omitted facts cast doubt on the existence of probable cause [then] they rise to the level of misrepresentation." United States v. Garza, 980 F.2d 546, 551 (9th Cir. 1992).  If after hearing it is determined that the affidavit is afflicted by falsehoods or omissions, then the affidavit is to be

Gill Memorandum of Points and
Authorities in Support of Motion
To Suppress

9

judged for probable cause without the offending material, or with the recklessly omitted material included.  Franks, 438 U.S. at 172.

IV.     **Argument.**

    A.     **The affidavit in the search warrant failed to establish probable cause to establish that the crime of witness tampering or a conspiracy to commit witness tampering was committed.**

Removing any unnecessary and/or irrelevant language the probable cause in the search warrant boils down to individuals were trying to find a witness in a criminal case. This simply is not a crime or a violation of the federal witness tampering statute. 18 U.S.C. 1512(b), the crime alleged to have been committed in the affidavit, states, in relevant part:

> (b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>   (1) influence, delay or prevent the testimony of any person in an official proceeding;
>   (2) cause or induce any person to--
>     (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>     (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
>     (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
>     (D) be absent from an official proceeding to which such person has been summoned by legal process; or
>   (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

Merely, finding a witness does not constitute the crime of witness tampering. To make finding a witness in a criminal proceeding a crime would deny a defendant a fair trial that is protected in the United States Constitution, Fifth and Sixth Amendments. The facts set forth in the affidavit

do not constitute a crime under either §1512(b) or any other statute. Further, since the underlying crime is not shown to have occurred there was no basis to establish a conspiracy to commit witness tampering.

> **B.    The affidavit in the search warrant failed to establish probable cause to establish Mr. Gill committed the crime of witness tampering or was a member of a conspiracy to commit witness tampering.**

For the same reasons as above, assuming that Mr. Gill, was the "Mark" that Mr. Romero was referring to, his actions set forth in the affidavit did not constitute any crime and, therefore, the affidavit fails to state probable cause for the issuance of a warrant. The only statements or acts attributed to Mr. Gill in the affidavit is that:

> **Mark] said they were looking for the "TRI."** Later in our interview, Deuce identified "they" as Bobby Hammond and Bob Reese. According to Deuce, Mark told him, **"I can either pay you to find the TRI or pay the Russians.[7]"** Exhibit B at 5-6.

Again, at most, the evidence shows that a Mark, later identified as Mr. Gill, was looking for the witness. Nowhere in the affidavit does it attribute to Mr. Gill doing anything that would constitute the crime of witness tampering as described in 18 U.S.C. § 1512(b), as set forth above.

> **C.    The "good faith exception" carved out of the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984) does not apply because the evidence was so deficient that no reasonable officer could rely on the warrant affidavit.**

Where there is an obvious lack of probable cause, as here, the level of probable cause is insufficient for a reasonable officer to rely on the warrant affidavit. *See Leon*, 468 U.S. at 924; *Millender v. County of Los Angeles*, 620 F.3d 1016, 1024-31 (9th Cir. 2010), *rev'd on other grounds*, 132 S. Ct. 1235 (2012); *United States v. Weaver*, 99 F.3d 1372, 1377-91) (6th Cir.

---

[7] No information in the affidavit states what "pay the Russians" means or who the "Russians" might be.

1996); *Greenstreet v. County of San Bernadino*, 41 F.3d 1306, 1309-10 (9th Cir. 1994): *United States v. Hove*, 848 F.2d 137, 139 (9th Cir. 1988); *United States v. Zimmerman*, 277 F.3d 426, 436 (3rd Cir. 2002). *United States v. Sartin*, 262 F. Supp. 1154 (D. Or. 2003) (Despite a 41-page affidavit, the court found no reasonable officer would believe the affidavit established probable cause where close analysis disclosed, through the mass of boilerplate and irrelevancies, no links to establish that contraband would be in the house to be searched).

In this case, there is absolutely no evidence that anyone was doing anything more than attempting to locate a witness in a criminal case. Assuming that a state police officer is familiar with the federal witness tampering statute, no reasonable officer would believe that the facts set forth in this affidavit established probable cause that a crime had been committed. For that reason the "good faith" exception does not save the warrant in this case.

### D. The Affidavits Contained Deliberate Falsehoods and Omissions, Necessitating a Hearing under Franks v. Delaware.

The affidavits in this case contain several false statements and omissions in relation to the statements allegedly made by Kim XYZ to officer Ferguson and Zwick. They allege that Kim made the following statement to them:

> On June 11, 2014, Deputy Ferguson and I went to that location and interviewed Kim XYZ. I asked Kim about "Deuce" and she told me Deuce showed up at her apartment within the last two weeks, but she could not remember the exact date. Kim told me Deuce told her out of respect for Kim's "ex", Deuce was not going to do the job he was hired to do. According to Kim, Deuce told her he was hired by Bobby Reese and Bobby Hammond **to find the TRI because the TRI is testifying against David Corbit, and he was supposed to find the information about TRI's current whereabouts and get the information back to Reese and Hammond**.
>      Kim told me she did not think Deuce was going to take action on finding or hurting TRI, but she (Kim) is scared to death of Bobby Hammond. I am aware

Gill Memorandum of Points and
Authorities in Support of Motion
To Suppress

12

that this is a widely-held fear. Kim told me Deuce has a phone number of . . .[8] Kim also said she was also scared for her own safety because Deuce told her that can happen is they (i.e. Hammond and/or Reese) go after your daughter to get to you. Kim reported that Deuce told her they (i.e. Hammond and/or Reese) reached out to Deuce because they did not want this scheme to be traced back to Brood members. Exhibit B at 4-5.

If called to testify at a *Franks* hearing, Kim XYZ[9] would testify that the statements in the warrant do not accurately reflect what she told the officers. In fact, contrary to the statements in the affidavit, she only talked to the officer's about her fear of Bobby Hammond, because they brought up the subject. She never mentioned or talked about Mr. Reese to the officers. Her impression, although she was never told this by Deuce, was that a Robert Palmer was the person Deuce was working for and that she told that to the police.

This Court should therefore, excise these false statements when analyzing the probable cause as set forth in the warrant. The only reason for making the false statements was to connect the finding of the witness to persons that the officers believe were capable of intimidating or threaten a witness, i.e. "evil persons." Therefore, this Court should find that the lack of connection to these individuals reduces the likelihood that the magistrate would have issued the warrant and was relevant to that determination.

When the court excludes these statements and reweighs the probable cause for the issuance of the warrant it should not consider the "good faith exception" set forth in *Leon,* supra

---

[8] The phone numbers and addresses in the affidavit are redacted from this memorandum.
[9] Kim XYZ has been identified and interview by an investigator for the defense, more than once, and is the basis for representing her testimony at a hearing. The defendant need not present clear proof that misrepresentations were deliberate or reckless in order to obtain a *Franks* hearing; all that is needed is a substantial showing. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005). Mr. Gill intents to call witnesses at the hearing on November 14, 2014 to make the requisite showing.

Gill Memorandum of Points and Authorities in Support of Motion To Suppress        13

at 468. For the reasons stated above no probable cause existed in the affidavit that could justify the issuance of the warrant.

**V.      Conclusion.**

For the reasons stated Mr. Gill asks the Court to suppress all the evidence seized as a result of the search warrant issued in this case because the warrant was issued without probable cause.

RESPECTFULLY SUBMITTED this 10th day of November 2014.

                                        s/ Robert W. Rainwater
                                      Robert W. Rainwater
                                      OSB # 084489
                                      (971) 271-7566
                                      Attorney for Defendant
                                      Mark Douglas Gill