S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Assistant United States Attorney
Leah.Bolstad@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
Telephone: (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:14-CR-00275-JO |
| v. | **RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS & MOTION FOR A *FRANKS* HEARING** |
| **MARK DOUGLAS GILL,** | |
| Defendant. | **Trial: November 18, 2014 Before: Hon. Robert E. Jones** |

The United States of America, by and through S. Amanda Marshall, United States
Attorney for the District of Oregon, and Leah K. Bolstad, Assistant United States Attorney,
respectfully submits this response to defendant's motion to suppress and request for a hearing
pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

I.    **FACTS**

A.    **Overview**

At issue is a federal search warrant issued by United States Magistrate Judge Paul Papak
on June 17, 2014.  The warrant was supported by the affidavit of Multnomah County Sheriff's
Office Deputy Joshua Zwick, an officer with over ten years of experience, at the time the warrant
issued.  He had experience from working in over 600 narcotics investigations that, in some
instances, involved witness tampering and harassment (Def. Ex. A at 2).

The affidavit was submitted in support of warrants to search defendant and his residence for evidence of Witness Tampering and Conspiracy to Commit Witness Tampering, in violation of Title 18, United States Code, Sections 1512(b) and 1512(k).  Such evidence included:

  a.  Indicia of occupancy or ownership including personal mail, checkbooks,  personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed or undeveloped), leases and mortgage bills.

  b.  Documentation of or symbols consistent with gang membership or gang affiliation.

  c.  Handwritten or printed records, photographs, and videos showing associations between gang members and associates including Deuce Mark Romero, Mark Gill, Bobby Hammond, Bob Reese, Dave Corbit, other Brood (KRB) members, European Kindred (EK) or other local street gangs.

  d.  Inmate booking data, mug shots, criminal case information, indictments, police reports.

  e.  Mailed letters, financial records such as money orders, contract documents, written notes or ledgers, wire transfer records, cashier's checks and receipts, account records, passbooks, safe deposit box keys and records, checkbooks, and check registers

  f.  Cellular telephones and other communications devices which constitute evidence of participation in a conspiracy to engage in witness tampering, may be seized, and may be searched for: assigned telephone number, stored list of received, sent, or missed calls; stored contact information; stored photographs of associates, suspected criminal activity, and/or the user of the phone or co-conspirators; and stored text messages.

  g.  Computers, thumb drives

Officers executed the warrants on June 19, 2014.  During the preliminary clearing of the house and identification of occupants, the officers observed in plain view evidence of drug trafficking, including digital scales, methamphetamine in plastic baggies, imitation firearms, and multiple cellular phones.  Defendant was advised of his *Miranda* rights, and he indicated he understood those rights by saying "yes."  Deputy Zwick and ATF Special Agent Hobaugh

**Govt's Response to Def's Motion to Suppress & *Franks* Hearing                    Page 2**

interviewed defendant.  Defendant confessed to being a drug dealer, admitted possession of the methamphetamine seized in multiple locations in his residence, and identified the individuals who supplied him with distribution quantities of controlled substances.  Pursuant to the search warrant, agents seized cellular phones and computers.  On defendant's phone, agents found a text message defendant received from Bobby Hammond on February 27, 2014: "Its hammond.  Call me… it's important."  Earlier that same day, February 27, 2014, federal agents arrested David Corbit on a federal drug trafficking case (14-CR-0093-MO).

During the low-key interview with defendant during which the agents shared pizza with him, agents asked defendant if he would allow them to seize the drugs and drug paraphernalia and any other drug-related items that were not authorized to be seized in the search warrant. Defendant said yes, so long as he did not have to pay for those items to be destroyed.

### B.     Probable Cause Statement in Deputy Zwick's Affidavit

To establish probable cause to support the issuance of warrants, Deputy Zwick laid out a number of facts (¶¶5-18), followed by a recitation of his experience and knowledge about witness tampering in the gang and organized crime context (¶¶19-26).  The following points highlight the information presented by Deputy Zwick on June 17, 2014 to Judge Papak in support of probable cause for witness tampering:

1. Deputy Zwick received information that two known associates (Bobby Hammond and Bobby Reese) of a federally indicted Brood gang leader (David Corbit) were looking for a person (the TRI) they believed to be a witness testifying against Corbit.  Three separate civilians provided information to Deputy Zwick regarding this matter: a TRI (the intended victim of the tampering), Kim XYZ, and Deuce Romero.  (Zwick Aff. ¶ 8).

2.  Bobby Reese was known by Zwick to be in charge of the Krude Rude Brood
    (KRB or "Brood") gang while other leaders, such as Corbit, were in custody.
    Bobby Hammond was known by Zwick to be a member of the European Kindred
    (EK) gang and had prior convictions for burglary, theft, gun charges, and was
    involved in at least one armed robbery.  (Zwick Aff. ¶ 7)

3.  Deputy Zwick learned the following from the TRI: the TRI received information
    from a friend named Kim.  Kim told the TRI that a man named "Deuce" had just
    visited Kim and had asked Kim about the TRI's whereabouts, and whether Kim
    had the TRI's phone number.  The TRI learned from Kim that Deuce said he was
    looking for the TRI on behalf of Bobby Reese and Bobby Hammond.  (Zwick
    Aff. ¶ 8).  The reason they wanted to find the TRI was because they believed the
    TRI is testifying against Dave Corbit.  Deputy Zwick explained that Dave Corbit
    was arrested in February 2014 and was currently pending federal charges for a
    drug conspiracy and state charges for violent crimes (Kidnap I, Assault II, UUW).
    (Zwick Aff. ¶ 8).

4.  Deputy Zwick alerted Judge Papak to the fact that he intercepted a piece of mail
    Dave Corbit sent to one of his victims from jail, and in Zwick's opinion, the
    contents of Corbit's letter suggested an intent to "sway" that victim's testimony.
    (Zwick Aff. page 4, fn 2).

5.  Deputy Zwick summarized recorded jail calls made in the past four months by
    Brood leader Dave Corbit to his girlfriend and gang associates who remained out-
    of-custody.  In those calls, Dave Corbit sounded desparate to avoid prosecution
    and imprisonment, and he urged his associates to work together regarding his

"freedom."  Deputy Zwick identified one of those associates as M_____ (he did not use the man's full name in order to protect him), a man on post-prison supervision following a murder conviction.  Based on the recorded calls between Corbit and his girlfriend, it was clear to Zwick that Corbit had enlisted M_____ to accomplish something on his behalf.  (Zwick Aff. ¶ 9).

6.  Deputy Zwick tracked down M_____, explained that he (Zwick) knew that Dave Corbit had asked for M_____'s assistance, and advised him that it would be a very poor idea to take action or relay any messages on behalf of Dave Corbit. (Zwick Aff. ¶ 9).

7.  Within days of his warning to M____, Deputy Zwick heard Corbit on jail calls instructing his girlfriend to abort the plan because the "Feds" were already on top of it.[1]  (Zwick Aff. ¶ 9).

8.  In late May, Deputy Zwick arrested another Brood associated (Shanan Kelly), searched his phone, and found a text message from Dave Corbit's girlfriend instructing the recipient to abort the plan.  (Zwick Aff. ¶ 9).

9.  On June 11, 2014, two deputies interviewed Kim.  They asked her about "Deuce" and she recounted that Deuce came to her residence looking for the TRI, but he told her that out of respect for her "ex," he was not going to do "the job" he was hired to do.  According to Kim, Deuce explained he had been hired by Bobby Reese and Bobby Hammond to find the TRI because the TRI is testifying against David Corbit.  Once Deuce obtained this information as to the TRI's whereabouts,

---

[1] This supports the idea that Corbit was attempting to send someone a message through M_____, and when it became apparent to Corbit that the police were monitoring the situation closely, he changed course.

he was to provide that information to Reese and Hammond. (Zwick Aff. ¶ 10).

10.  Kim provided her assessment of this event to Deputy Zwick.  She said she was not worried about Deuce finding or <u>hurting</u> the TRI, but Bobby Hammond's involvement was a different matter.  Kim stated she was scared to death of Bobby Hammond.  Deputy Zwick was not surprised, having heard similar sentiments from others.  Kim relayed she was afraid for <u>her own safety</u> now because of what Deuce told her – the worst thing that can happen is they (i.e. Hammond and Reese) <u>go after your daughter to get to you</u>.  (Zwick Aff. ¶ 11).

11. Kim explained that Deuce told her they [Hammond and Reese] reached out to Deuce because they did not want this scheme to be traced back to Brood members.[2]  (Zwick Aff. ¶ 11).

12. Deputy Zwick found Deuce Romero, a convicted felon, and approached him at his residence.  There, Deputy Zwick found a loaded firearm in Deuce's backpack. (Zwick Aff. ¶ 15).

13. Deputy Zwick asked Deuce why he had asked Kim about the TRI.  Deuce explained that he heard the TRI was testifying and he went to warn Kim to not get involved with these people.  This was a very different account of that interaction from what Deputy Zwick learned from Kim.  (Zwick Aff. ¶ 13).

14. Deputy Zwick asked Deuce where or from whom, specifically, he learned that TRI was going to be a witness.  Deuce said he learned this from Mark Gill. Deuce said Mark Gill told him that Bobby Reese and Bobby Hammond were

---

[2] In other words, they knew that what they were doing was criminal, wrong, and did not want to get caught.  They were not merely looking for a witness for their friend David Corbit.

**Govt's Response to Def's Motion to Suppress &** *Franks* **Hearing**          **Page 6**

looking for the TRI, and Mark told him "I can either pay you to find the TRI or pay the Russians." (Zwick Aff. ¶¶ 13-14).

15. Deuce described Mark Gill as an older guy who lives out east and associates with Joseph Jacobus and Bob Reese (who Zwick knew to be actively leading Brood). (Zwick Aff. ¶¶ 14, 7).

16. Deuce described his own relationship with Bob Reese as follows: Reese would ask Deuce to find people who owed drug debts to Reese. (Zwick Aff. ¶15).

17. Deputy Zwick described Mark Gill as a Brood associate who lives in Fairview, and Zwick learned from a law enforcement partner that he had observed Bob Reese at Gill's residence in Fairview. Deputy Zwick listed Mark Gill's prior convictions involving drug possession, drug distribution, and unlawful possession of a firearm. (Zwick Aff. ¶¶ 14, 17-18).

18. Based on his training and experience, Deputy Zwick alerted the Court to several critical circumstances relevant to this investigation:

> a. Informants and cooperating witnesses present a threat to the ongoing success and power held by local street gangs. Because of this threat, gang members often attempt to dissuade informants or cooperating witnesses from testifying against them in criminal prosecutions. Because the gang member or leaders are often incarcerated pending trial, they accomplish this goal of deterring cooperators by sending third parties to do this work for them. (Zwick Aff. ¶ 24).
>
> b. Persons who are identified as "snitches" on the street often face repercussions and retaliation from those believed to have been "snitched" against as well as their friends and fellow gang members or associates. (Zwick Aff. ¶ 22).

       c.   I know from my training and experience that violent street gangs in this area often employ or assign certain members the role of "enforcer." These individuals are perceived by fellow gang members and the wider community as persons capable of enforcing gang rules and protecting members through the use of violence and intimidation.  I know that enforcers often have violent criminal histories, which enhances the perception that enforcers are capable of inflicting harm on those who break the rules or infringe on one gang's territory. (Zwick Aff. ¶ 23).

## II.    ANALYSIS

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  Under the Fourth Amendment, an individual is "entitled to be free from unreasonable governmental intrusion" whenever the person "may harbor a reasonable expectation of privacy."  *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

Defendant challenges whether probable cause existed at the time Magistrate Judge Papak issued the underlying search warrant for defendant's residence on June 17, 2014.  Whether an affidavit sets forth sufficient facts to give rise to probable cause to believe that evidence of a crime will be found in a particular location depends upon the totality of the circumstances. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 246 (1983)).    Probable cause means a fair probability, which in turn, is something less than a preponderance.  *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007).  "The process does not deal with hard certainties, but with probabilities."  *Gates*, 462 U.S. at 231.  "It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands . . ."  *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975).

    //

A.    **The Facts Presented in the Search Warrant Affidavit Provided Ample Probable Cause for Witness Tampering and Conspiracy to Commit Witness Tampering**

The federal crime of witness tampering, in violation of Title 18, United States Code, Section 1512(b), provides in relevant part that "whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, . . . with intent to influence, delay, or prevent the testimony of any person in an official proceeding shall be fined . . . or imprisoned not more than ten years, or both."   Whoever conspires to commit any offense in Section 1512 shall be subject to the same penalties.  18 U.S.C. 1512(k).  To establish a violation of Section 1512(b), the government must show a person (1) knowingly (2) uses or attempts to use intimidation, threats, or corrupt persuasion to (3) influence, delay or prevent the testimony of a person (4) in an official proceeding.  To establish the crime, it is not necessary that the intended victim receive the threat/intimidation/persuasion, nor is it necessary that she or he actually be influenced in any way.  *See United States v. England*, 507 F.3d 581, 589 (7th Cir. 2007).

1.    **Judge Papak's Finding of Probable Cause Was Supported By Facts Describing the Attempts of Federally Indicted Gang Members to Tamper with Government Witnesses.**

In his affidavit, Deputy Zwick established each requisite element of the crime of witness tampering.  He demonstrated that in February 2014, Brood gang leader David Corbit was federally indicted for a Drug Conspiracy, an identified case (14-CR-0093) in which an "official proceeding" would formally take place in the form of a federal trial.   Zwick described how David Corbit seemed to be handling that fact – not well.  Corbit seemed desperate to get out of trouble, desperate to avoid a 15-year sentence, and was calling upon his out-of-custody gang associates to help him by finding witnesses suspected to be testifying against him.  Those gang associates included, at minimum, Bobby Reese (who was temporarily taking a leadership

position in Brood) and Bobby Hammond, known to be a violent person feared by many. Deputy Zwick also described how he intercepted a jail mail communication from Corbit to the victim of one of his state crimes in which Deputy Zwick interpreted the message as discouraging the witness from coming forward and cooperating with authorities. Thus, Deputy Zwick established that Corbit had, in fact, knowingly reached out to at least one potential witnesses to influence (discourage) or prevent his testimony. It was not a stretch of the imagination to accept that Corbit would be doing the same as to TRI, albeit through a more circuitous route.

Deputy Zwick's interviews with the TRI and Kim establish the threatening and intimidating nature of the incident in which Deuce Romero visited Kim. The TRI expressed her own fear for TRI's own safety that stemmed from receiving word from Kim that a man named Deuce was looking for the TRI, that he was hired by Bobby Hammond to find the TRI, and the reason they were looking for the TRI was because it was believed the TRI would be testifying (ie, in an official proceeding) against Dave Corbit. Similarly, Kim told Deputy Zwick that Bobby Hammond scared her to death. Part of Deuce's message, as relayed by Kim to Zwick, was that "the worst thing that can happen is they (i.e. Hammond and Reese) <u>go after your daughter to get to you</u>." (Zwick Aff. ¶ 11). In essence, the affidavit facts established that Corbit enlisted his gang associates to hire someone to not only find the TRI (who was believed to be a potential witness against him at an official proceeding), but to intimidate and corruptly persuade through veiled threats to the person to achieve the result of preventing or hindering that person from testifying. The person hired to do this, Deuce, told Deputy Zwick that Mark Gill hired him to do this search on behalf of Hammond and Reese.

Based on these facts, it was clear to the issuing magistrate that when an individual learns that he or she is suspected of being an informant or witness against a powerful gang leader like

David Corbit, and that Bobby Hammond is working on Corbit's behalf to hire people to find that suspected informant, that in itself is a frightening and intimidating message to hear about third hand. Add the veiled threats about "using your daughter to get to you," and it is enough to successfully dissuade people from testifying.

Although defendant would like this Court to limit its examination of the affidavit to the information Deputy Zwick provided under the heading of probable cause, it is well-established that the training and experience of law enforcement agents bears significantly in probable cause determinations. *Gates*, 462 U.S. at 232. "Officers assigned to specialized areas of enforcement become familiar with the methods of those engaged in particular types of criminal activity, giving them an ability to detect unlawful activity where laymen might not." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (internal quotations omitted).

> **2.    Judge Papak's Finding of Probable Cause Should Be Afforded Deference Based on the Preference to be Accorded Warrants.**

When a reviewing court evaluates a finding of probable cause, the analysis is commonsense, practical and deferential. *United States v. Krupa,* 658 F.3d 1174, 1177 (9th Cir. 2011). A reviewing court should err on the side of affirming an issuing court's probable cause determination: doubtful or marginal cases in this area should largely be determined by the preference to be accorded to warrants. *United States v. Kelley,* 482 F.3d 1047, 1050 (9th Cir. 2007). If the "existence of probable cause is marginal, the decision should be tempered by the preference to be accorded search warrants." *United States* v. *Ventresca,* 380 US 102, 109, 85 S Ct 741, 13 L.Ed 2d 684 (1965).

In the present case, Deputy Zwick sought and received judicial authority to search defendant's residence. Judge Papak approved the search warrant. The inclination to second-

guess an issuing magistrate's approval of probable cause should be tempered by the preference to be accorded to search warrants.

### B.   A *Franks* Hearing is Not Warranted

There is "a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  A defendant who challenges the validity of an affidavit is entitled to an evidentiary hearing only if he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  *Id*. at 155-56 (emphasis added). The same standard applies to omissions.  *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004); *United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir. 1985).   Defendant's showing fails to meet either prerequisite.

The Ninth Circuit has identified five requirements which must be met before a defendant is entitled to a *Franks* hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. DiCesare*, 765 F.2d 890, 894-95 (9th Cir.), *amended*, 777 F.2d 543 (1985) (citation omitted).  *See also United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008)("To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof").  Defendant has failed to meet those requirements here.

**Govt's Response to Def's Motion to Suppress &** *Franks* **Hearing**                    **Page 12**

**1.    Defendant's Offer of Proof Falls Far Short of a Substantial Showing.**

In the context of *Franks* hearings, "the movant bears the burden of proof and must make a substantial showing to support both elements" – i.e., false statements intentionally or knowingly made and a showing of materiality.  *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).  The defendant's showing "must be more than conclusory and must be supported by more than a mere desire to cross-examine."  *Franks*, 438 U.S. at 171.  "Allegations of negligence or innocent mistake are insufficient."  *Id*.  Neither are speculative allegations. *United States v. Lingenfelter*, 997 F.2d 632, 640 (9th Cir. 1993).  Rather, there must be "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  *Franks*, 438 U.S. at 171.  "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  *Id*.  The absence of an affidavit or sworn statement offering proof of deliberate or reckless falsehood "is enough in itself" to defeat a demand for a *Franks* hearing.  *United States v. Ruddell*, 71 F.3d 331, 334 (9th Cir. 1995); *see also United States v. Furrow*, 229 F.3d 805, 815 (9th Cir. 2000) (where the defendant filed no affidavits or other offers of proof and did not explain his failure to do so, his promise to present evidence of reckless disregard for the truth at a Franks hearing was not sufficient to warrant holding one), overruled on other grounds by *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (en banc).

In his brief, defendant cites just three inaccuracies in Deputy Zwick's affidavit which he suggests amount to deliberate falsehoods.  Def. Mem. at 13.  Each of the alleged inaccuracies concerns what Kim XYZ[3] reported to Deputy Zwick.  T  Defendant fails to present a single shred of evidence to prove up these inaccuracies in his non-existent offer of proof.  Defendant fails to

establish how or why Deputy Zwick would deliberately include these kinds of falsehoods in an attempt to mislead the issuing judge.  Defendant did not present a single affidavits, declaration, report, or exhibit to substantiate his bare assertions.  In the absence of the required substantial showing through an actual offer of any proof, this Court would be well-within its discretion to deny defendant's motion for a *Franks* hearing.  *See Ruddell*, 71 F.3d at 334 (absence of an affidavit or sworn statement offering proof of deliberate or reckless falsehood "is enough in itself" to defeat a demand for a *Franks* hearing).

### 2.    The Allegedly "False" Statements Are Not Necessary to the Finding of Probable Cause.

Even assuming the defendant's mere conclusory assertions in a legal brief is deemed to be a sufficient showing that the alleged inaccuracies are in fact "false statements" made with the requisite mental state, those inaccuracies are <u>immaterial</u> and have no bearing on the probable cause finding made by Judge Papak.  The government will address each alleged inaccuracy in turn.  First, defendant asserts "contrary to the statements in the affidavit [Kim] only talked to the officers about her fear of Bobby Hammond because they brought up the subject."  Def. Mem. at 13.  In other words, the defendant is not arguing that Deputy Zwick falsely reported Kim's reported fear as to Bobby Hammond or even reported the statements inaccurately; rather, defendant's alleged inaccuracy is that Deputy Zwick failed to correctly describe the context of the conversation in which Kim offered that information.  Assuming for a moment that the context was exactly as defendant now describes, whether the agents asked her if she feared Bobby Hammond or whether she volunteered that information, either way, the point is that she is afraid of him.  That point is accurately captured in the affidavit. See Def. Exh. A at page 5, ¶ 11.

---

[3] This Court should be made aware, as Deputy Zwick made Judge Papak aware when he applied for the warrant, Kim XYZ has prior felony convictions. (Zwick Aff. ¶ 11).

**Govt's Response to Def's Motion to Suppress &** *Franks* **Hearing**                    **Page 14**

Second, defendant alleges that Kim "never mentioned or talked about Mr. Reese to the officers" and thus Deputy Zwick's statements to the contrary are deliberate falsehoods. Deputy Zwick is confident that he accurately reported Kim's statements: Deuce told Kim he had been hired by Reese and Hammond to find the TRI. Even if Kim did not include Reese's name in her report to Deputy Zwick, he received that information from the two other sources of information in the affidavit – the TRI and Deuce. The TRI reported to Zwick what Kim had relayed to the TRI – that Deuce came by Kim's house looking for the TRI, and Deuce had told Kim that he was hired by Hammond and Reese to find the TRI who was believed to be a witness testifying against Dave Corbit. *See* Def. Exh. A at page 3, ¶ 8. Moreover, Deuce Romero provides this exact same account, corroborating the reports Zwick received from both Kim and the TRI. Specifically, Deuce Romero told Deputy Zwick that Bobby Hammond and Bob Reese were actively looking for the TRI, and that he learned this information from defendant Mark Gill. *See* Def. Exh. A at page 6, ¶ 13. Deuce Romero also provided Deputy Zwick with additional information substantiating the link between himself and Bob Reese, who was, in turn, linked to defendant Mark Gill. Romero and explained how in the past, Reese asked Deuce to find people who owed drug debts to Reese. *See* Def. Exh. A at page 7, ¶¶ 14-15. Thus, regardless of whether Kim mentioned Reese or not, Deputy Zwick had statements from Romero and the TRI who described Reese's involvement in hiring Deuce Romero to find the TRI. Even if the Court were to find deliberate falsehood or reckless disregard in Deputy Zwick's inclusion of Kim mentioning Bob Reese's name, and even if the Court were to strike the affidavit language where Kim mentions Reese's name, that does nothing to negate probable cause established by the remainder.

Third, the defendant now presents an entirely different version events from Kim who, after meeting with defense investigators, now retracts what she said before to Deputy Zwick about Hammond and Reese and assigns blame to a new person ("Robert Palmer") for hiring Deuce Romero to find the TRI. This is ridiculous. Not only is this new version of events not in a sworn affidavit, it is presented as mere speculation regarding her "impressions." Def. Mem. at 13. Moreover, the defense does not assert how this would constitute a material omission. Thus, this third alleged inaccuracy is incomprehensible and does not warrant further attention.

Even after redacting the alleged errors in the search warrant affidavit, the affidavit still sets forth ample probable cause. Accordingly, defendant has not made the substantial preliminary showing required to trigger a *Franks* hearing. Defendant's motion to suppress and for a *Franks* hearing should be denied.

## III.    CONCLUSION

Deputy Zwick's affidavit established a fair probability that a witness tampering crime had occurred, and that evidence of that crime would be found at defendant's residence. None of the affidavit inaccuracies or omissions defendant identified were deliberately or recklessly made. None would have affected the issuing judge's probable cause determination. Defendant has failed to make the substantial preliminary showing required to justify holding a *Franks* hearing. Defendant's motion to suppress and for a *Franks* hearing should be denied.

DATED this 13th day of November, 2014.

Respectfully submitted,
S. AMANDA MARSHALL
United States Attorney

*/s/ Leah K. Bolstad*
LEAH K. BOLSTAD, OSB #052039
Assistant United States Attorney

**Govt's Response to Def's Motion to Suppress & *Franks* Hearing**          **Page 16**